{¶ 1} David McClain, defendant-appellant, appeals his convictions for gross sexual imposition. For the reasons that follow, we affirm the convictions, but remand for correction of the trial court's docket.
 {¶ 2} Appellant was indicted by a Cuyahoga County Grand Jury on two counts of rape, two counts of gross sexual imposition, and one count of kidnapping. All the counts contained sexually violent predator, repeat violent offender, and notice of prior conviction specifications.
 {¶ 3} The case proceeded to a jury trial.[1] At the conclusion of the State's case, the defense made a Crim.R. 29 motion for acquittal, which was denied. Appellant then presented testimony, and at the conclusion of his case, renewed his Crim.R. 29 motion for acquittal, which was again denied. The jury found appellant not guilty of rape, not guilty of kidnapping, and guilty of both counts of gross sexual imposition. Appellant was sentenced to 18 months on each count, with the sentences ordered to run concurrently.[2] He was also labeled an habitual sexual offender.
 {¶ 4} The trial testimony demonstrated that the victim, a then 22-year-old woman with a brain injury and speech impediment, and appellant, then 56 years-old, *Page 4 
had a sexual encounter. The testimony conflicted as to the nature of the encounter; the victim maintained appellant forced her, and appellant maintained it was consensual.
 {¶ 5} According to the victim, she was walking from her home to a nearby store. When she arrived at the store's parking lot, she encountered appellant, who was driving a van. She testified that she had never seen appellant before. Appellant asked her what she was doing and she told him that she was going to get something to eat. He told her that he would take her to get something to eat, so she voluntarily got into his van. It was approximately 6:30 p.m.
 {¶ 6} While riding in the van, appellant rubbed her leg, and she pushed his hand away. After a fifteen-to-twenty-minute drive, without stopping, they arrived at an apartment building, indicated by appellant to be his brother's residence. Appellant and the victim entered the building and went to the "brother's" apartment.
 {¶ 7} The victim testified that once she and appellant were inside the apartment, appellant pushed her into a bedroom, pushed her on the bed and tried to kiss her.
 {¶ 8} She testified that appellant then pulled her shirt off and removed her pants and underpants. The victim testified that she started to scream and appellant hit her on the face. She testified that she screamed again, and that appellant bit her chin, causing her to bleed slightly. At that point, she stopped screaming and physically resisting. The victim then described appellant putting his penis inside her *Page 5 
vagina "a little," rubbing it over her vagina, then ejaculating on the outside of her vagina.
 {¶ 9} She testified that they then got dressed and went into the kitchen for five or six minutes where the "brother" was preparing food. She and appellant then left the apartment and got into his van. She asked appellant to take her to the parking lot where he had picked her up, but appellant took her to a gas station. After appellant left, she asked the cashier to call the police because she had been raped.
 {¶ 10} The victim testified that appellant did not offer her money; he only offered to buy her something to eat. She denied that his offer to buy her something to eat was in exchange for sex.
 {¶ 11} On cross-examination, the victim admitted that she had seen appellant on a prior occasion. She further admitted that in a previous statement to the police she said that she had met appellant a few weeks prior to the incident, but testified that she should have told the police that she had only seen him on a prior occasion. The victim also admitted that, although her trial testimony was that she got in appellant's van at 6:30 p.m., her two statements to the police varied from that testimony and from each other. Specifically, in her first statement to the police, made on March 8, 2005, she said that she got into the van at 7:15 p.m. and in her second statement, made on May 16, 2005, she said that she got into the van at 8:30 p.m. *Page 6 
 {¶ 12} The victim further admitted that, in contradiction to her trial testimony that appellant put his penis into her vagina "a little," she originally told the police that he put his penis on, not in, her vagina.
 {¶ 13} Cleveland police officer Stephen Zedella, who responded to the gas station where appellant had dropped off the victim, also testified. Zedella did not recall seeing any blood on the victim's face or clothing, and he did not recall the victim telling him that she was bleeding. He did notice, however, swelling and bruising around her right eye.
 {¶ 14} The emergency room doctor who treated the victim, Sandra Chisar, also testified. She saw a bite mark on the victim's chin and swelling and bruising around her eye and on her arms and legs, but not blood. Dr. Chisar administered a rape kit to the victim, and saw redness and irritation on the external genitalia, which was consistent with forceful sex.
 {¶ 15} The specimen collected during the performance of the rape kit was compared to specimen taken from appellant. The DNA analysis of the specimen was consistent with the DNA profiles of appellant and the victim. DNA testing performed on the victim's clothing contained a mixture of DNA profiles consistent with appellant and the victim.
 {¶ 16} The investigating detective for the case, Christina Cottom, testified as well. Cottom testified that she took two statements from the victim: one on March 8, 2005, a few days after the incident and another on May 16, 2005, which was after *Page 7 
she had interviewed appellant. In neither statement did the victim state that appellant had penetrated her vagina. In fact, in her first statement, the victim specifically stated that appellant did not penetrate her with his penis but, rather, placed his penis on her vagina. Detective Cottom also questioned the victim about whether appellant had offered her money, which the victim denied. Detective Cottom further testified that during the March 8 interview, she observed faint remains of a bite mark on the victim's chin.
 {¶ 17} Appellant then presented a defense. Lloyd Campbell, the tenant of the apartment where the incident occurred, described appellant and the victim arriving unexpectedly.[3] According to Campbell, both appellant and the victim appeared to have been drinking. Upon entering the apartment, appellant and the victim went into his bedroom, with the victim entering first and appellant following her.
 {¶ 18} Campbell testified that while appellant and the victim were in his bedroom he was in the living room watching television. He explained that he had the air conditioner on, and between it and the television, he was unable to hear any noises coming from the bedroom. Campbell testified that between ten to fifteen minutes after they had entered the bedroom, appellant and the victim came out. The victim neither appeared upset, nor did she say anything to him. Campbell offered food to them, which they both accepted and left with. *Page 8 
 {¶ 19} Appellant then testified, stating that while driving in his van, he saw the victim and the two made eye contact. She put her arm up, so he pulled his van over. She approached the van, opened the door and got in. He asked her if she was "kicking it," and she nodded her head. He told her that he had $40 and then drove off.
 {¶ 20} Appellant testified that they first went to a drive-thru beverage store, where he purchased beer and cigarettes. Next, they went to a park, where he got out of the van to use the restroom and the victim waited for him in the van. They each had a beer in the van and then appellant drove them around for about an hour before going to Campbell's apartment.
 {¶ 21} At Campbell's apartment, the two went into the bedroom, where he took off his shoes and pants and the victim simultaneously took off her blouse and pants. Appellant then described the two having a sexual encounter, during which he sucked on her chin. Appellant described ejaculating before they could have intercourse. According to appellant, he and the victim were "disgusted" by that, their encounter ended, they got dressed and left the bedroom. After accepting some food from Campbell, they left the apartment.
 {¶ 22} According to appellant, while they were on the elevator and in the lobby, the victim asked him for her money. Appellant did not respond. They both got into his van and left, and as appellant was on an exit ramp to get off the highway, the *Page 9 
victim opened her door and tried to get out. She asked him again for her money. Appellant testified that he pulled over to a curb and she got out of the van.
 {¶ 23} Appellant explained that he thought the victim was a prostitute, as the area where he first encountered her was known for prostitution, and that he offered her $40 in exchange for sex. Appellant admitted that there was no explicit discussion about sex, but testified that "kicking it" means sex "on the streets." He further explained that he did not pay her because he used the money to buy alcohol and cigarettes. Appellant denied hitting, or threatening to use force on, the victim.
 {¶ 24} In his sole assignment of error, appellant contends that his convictions were against the manifest of the evidence. We disagree.
 {¶ 25} A court considering a manifest weight claim "review[s] the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses." State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. The question to be determined is "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 175.
 {¶ 26} R.C. 2907.05(A)(1), governing gross sexual imposition, provides in pertinent part as follows: *Page 10 
 {¶ 27} "(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender * * * when * * * [t]he offender purposely compels the other person * * * to submit by force or threat of force."
 {¶ 28} In support of his assigned error, appellant essentially argues that the victim was not credible. Specifically, appellant points to the inconsistencies in her testimony as compared to her statements to the police, mainly the differing times she alleged she got into appellant's van and whether he penetrated her.
 {¶ 29} Upon review, we do not find that, in evaluating the inconsistencies in the victim's testimony, "the jury clearly lost its way." In regard to the varying times as to when she entered appellant's van, the victim testified that she could not be sure of the time because of the lapse of time (i.e., her first statement was made on March 8, 2005, her second statement was made on May 18, 2005, and she testified on February 14, 2006). In regard to the penetration issue, the jury acquitted appellant of rape. The remaining evidence, however, supports the gross sexual imposition convictions.
 {¶ 30} Specifically, officer Zedella, Dr. Chisar and Detective Cottom corroborated the victim's testimony about the use of force during the incident. Zedella testified that he saw swelling and bruising around her right eye, and Dr. Chisar testified that she saw a bite mark on the victim's chin, as well as swelling and bruising around her eye and on her arms and legs. Detective Cottom testified that, *Page 11 
when she interviewed the victim a few days after the incident, she saw faint remains of a bite mark on her chin.
 {¶ 31} Upon review, the victim's version of the events was not so incredulous that "a manifest miscarriage of justice" was had by appellant's convictions. Accordingly, appellant's assignment of error is overruled.
 {¶ 32} Finally, sua sponte, we address two issues not raised by appellant, but affecting his substantial rights. See Crim.R. 52(B). First, as previously noted, the conviction and sentencing entries both state that gross sexual imposition is a felony of the third degree when, in fact, it is a fourth degree felony. See R.C. 2907.05(B). While appellant received the correct sentence for a fourth degree felony and, therefore, does not need to be resentenced, the trial court's docket needs to be corrected to reflect the appropriate felony level for gross sexual imposition.
 {¶ 33} Second, the gross sexual imposition counts were each indicted with sexually violent predator, repeat violent offender and notice of prior conviction specifications. Those specifications were improperly indicted. In particular, a sexually violent predator specification, pursuant to R.C. 2941.148, applies to sexually violent offenses, homicide, assault or kidnapping. Gross sexual imposition is defined as a sexually violent offense only in instances where the victim is 13 years old or older but less than 16 years old, and the offender is at least 18 years old and four or more years older than the victim. See R.C.2941.148, 2971.01(G) (L), 2907.05(A)(4). That is not the case here. *Page 12 
 {¶ 34} In regard to the repeat violent offender specifications, R.C.2941.149 and 2929.01(EE) provide that such a specification applies only to aggravated murder, murder, involuntary manslaughter, a first degree felony, or a second degree felony that involves an attempt to cause serious physical harm to a person or that results in serious physical harm to a person. Moreover, R.C. 2929.13(F)(6), governing notice of prior conviction specifications, provides that such a specification is only applicable to first and second degree felonies.
 {¶ 35} Based on the above, the indictment, and subsequent finding of guilt by the trial court on the sexually violent predator, repeat violent offender and notice of prior conviction specifications attendant to the gross sexual imposition counts were improper. At sentencing, however, the court did not consider or sentence pursuant to any of the specifications. In fact, defense counsel stated that there was no presumption in favor of prison and asked the court to consider community control sanctions.[4] Even though appellant's rights at sentencing were not affected by the specifications, the court's docket needs to be corrected to remove the findings of guilt as to those specifications.
Judgment affirmed; remanded for correction of the trial court's docket.
It is ordered that appellee recover from appellant costs herein taxed.
 The court finds there were reasonable grounds for this appeal. *Page 13 
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANN DYKE, J., and PATRICIA A. BLACKMON, J., CONCUR
[1] The defense stipulated to the prior conviction and therefore the repeat violent offender and notice of prior conviction specifications were not tried to the jury.
[2] The entries of conviction and sentence both incorrectly state that the gross sexual imposition convictions are felonies of the third degree; they are fourth degree felonies.
[3] Campbell was appellant's friend, not his brother.
[4] R.C. 2929.13(F)(6) states that a court "shall impose a prison term" when there is a notice of prior conviction. *Page 1